

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-2000

# Carpet Grp Int'l Corp v. Oriental Rug

Precedential or Non-Precedential:

Docket 99-5931

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Carpet Grp Int'l Corp v. Oriental Rug" (2000). *2000 Decisions.* Paper 193.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/193

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 8, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5931

CARPET GROUP INTERNATIONAL; EMMERT ELSEA

v.

ORIENTAL RUG IMPORTERS ASSOCIATION, INC.;
BASHIAN BROS., INC.; ALFANDARI AND ETESSAMI
ORIENTAL RUG CO., INC.; MOUSSA ETESSAMI & SONS
CORP.; NOONOO RUG CO.; PANDE CAMERON & CO. OF
NEW YORK; KELATY RUGS INTERNATIONAL; DANIEL
HODGES; GEORGE NEWMAN; ISAAC ETESSAMI

   Carpet Group International Corporation
   and Emmert Elsea,

   Appellants

Appeal from the United States District Court
For the District of New Jersey
D.C. No.: 95-cv-05574
District Judge: Honorable Joseph A. Greenaway, Jr.

Argued: July 21, 2000

Coram: RENDELL, ROSENN, Circuit Judges, and
O'NEILL,* District Judge.

(Filed: September 8, 2000)

_____

* Honorable Thomas N. O'Neill, Jr., United States Senior District Court
Judge for the Eastern District of Pennsylvania, sitting by designation.

David U. Fierst (Argued)
Stein, Mitchell & Mezines
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

 Counsel for Appellants

Christopher Sprigman (Argued)
Robert B. Nicholson
United States Department of Justice
Antitrust Division
601 D Street, N.W.
Patrick Henry Building
Washington, DC 20530

 Counsel for Amicus-Appellant

William J. O'Shaughnessy (Argued)
McCarter & English
100 Mulberry Street
Four Gateway Center
Newark, NJ 07101-0652

Howard M. Nashel
Nashel, Kates, Nussman, Rapone,
Ellis & Traum
190 Moore Street, Suite 306
Hackensack, NJ 07102

Arthur M. Lieberman
Lieberman & Nowak
350 Fifth Avenue
Suite 7412
New York, NY 10118

Stuart Reiser
Shapiro & Croland
411 Hackensack Avenue
Hackensack, NJ 07601

 Counsel for Appellees

2

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal arises out of an action under the Sherman Act alleging a conspiracy to restrain trade and monopolize the thriving United States market for oriental rugs. 1 It requires us to determine, among other things, whether the Foreign Trade Antitrust Improvements Act ("FTAIA" or "the Act"), 15 U.S.C. S 6, divested the District Court of subject matter jurisdiction over this action. The plaintiffs are Carpet Group International ("CGI"), a Virginia corporation, and Emmert Elsea, a citizen of Virginia who is CGI's founder and sole shareholder. Elsea founded CGI with the objective of making imported oriental rugs available to retailers directly from manufacturers, bypassing importers at the wholesale level and thereby reducing rug prices to United States consumers. The defendants charged with antitrust violations are an association of importer/wholesalers of oriental rugs called the Oriental Rug Importers Association, Inc. ("ORIA"), several companies who are members of ORIA, and three individuals who are past or present officers and directors of ORIA.

In the District Court and on appeal, the defendants object to the Court's subject matter jurisdiction primarily on the ground that the plaintiffs' claims were barred by the FTAIA. They assert that the plaintiffs failed to establish jurisdiction under the Act because they have not proven that the defendants' actions did not involve or otherwise substantially affect United States commerce.2 The United

_____

1. Figures recently released by the Oriental Rug Importers Association of the summary of United States Department of Commerce import figures for 1998 disclose that the United States imported a total of 106,929,000 square feet of rugs -- a sharp increase from the 1997 total of 87,300,000 square feet. The increase in dollar value of imports was similarly dramatic -- climbing to $422,549,000 in 1998 from $335,505,000 in 1997. See <http://www.oria.org/winter2000_4.htm>.
2. The plaintiffs contend that the District Court had subject matter jurisdiction over its antitrust claims pursuant to 28 U.S.C. S 1337 and over its state law claims pursuant to 28 U.S.C.S 1367. This Court has appellate jurisdiction pursuant to 28 U.S.C. S 1291.

States District Court for the District of New Jersey, acting on the report and recommendation of a Magistrate Judge, granted the motion of the defendants for dismissal of the action, and the plaintiffs timely appealed. We reverse.

I.

Firms involved in the oriental rug trade in the United States have traditionally utilized a narrow chain of distribution. In this carefully constricted chain, foreign rug manufacturers sell their goods to wholesalers in the United States, who import the rugs and then sell them to U.S. retailers. The retailers in turn resell the rugs to consumers. In the early 1990s, plaintiff Emmert Elsea conceived a plan by which retailers and consumers in this country could purchase oriental rugs more cheaply. He theorized that if U.S. retailers were to purchase rugs directly from foreign manufacturers, bypassing the wholesaler link in the chain of distribution, they could reduce the costs to themselves and, consequently, to consumers. Elsea founded CGI in order to facilitate his vision of a new chain of rug distribution.

In 1993 and 1994, CGI sponsored two trade shows in the United States at which foreign rug manufacturers were invited to display rugs and sell directly to American retailers. CGI expected to earn fees paid by the manufacturers for space at the trade show. In addition, Elsea, and later CGI, took U.S. retailers on buying trips to rug-producing countries in exchange for fees. On these trips, the plaintiffs arranged for the retailers to purchase rugs directly from foreign rug manufacturers. CGI's trade shows and buying trips were the mechanisms through which the plaintiffs attempted to effectuate their plan to assist American retailers in purchasing oriental rugs directly from the foreign manufacturer.

The plaintiffs claim that the defendants conspired to sabotage their efforts to facilitate direct sales between foreign manufacturers and United States retailers and, more specifically, conspired to wreck plaintiffs' trade shows. Plaintiffs' amended complaint alleges that the defendants used the following tactics:

4

(a) threatening not to purchase rugs from any manufacturer who participated in the trade shows;

(b) threatening not to purchase rugs from any manufacturer who sells rugs to any retailer on a buying trip;

(c) threatening and retaliating, including expulsion from the association, against any ORIA member that participated in the plaintiffs' trade shows;

(d) inducing the Carpet Export Promotion Council of India, the Export Promotion Board of Pakistan, and the Pakistan Carpet Manufacturers and Exporters Association not to subsidize the participation of manufacturers from those countries in the plaintiffs' trade shows;

(e) threatening not to sell rugs to retailers who participate in the buying trips sponsored by plaintiffs.

The defendants moved to dismiss the action for lack of subject matter jurisdiction. The defendants argued that the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. S 6a, deprived the District Court of subject matter jurisdiction under the antitrust laws by excluding the plaintiffs' claims from the coverage of those laws. The FTAIA provides, in relevant part,

Sections 1 to 7 of this title[, which include the Sherman Act,] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--

(1) such conduct has a direct, substantial, and reasonably foreseeable effect--

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations . . . .

15 U.S.C. S 6a.3 The District Court referred the motion to a Magistrate Judge. In accordance with circuit precedent, the

---

3. The FTAIA was enacted as Title IV of the Export Trading Company Act of 1982, Pub. L. No. 97-290, 1982 U.S.C.C.A.N. (96 Stat.) 1233, 1246.

5

plaintiffs introduced evidence to support their contention that the FTAIA did not apply to their claims and therefore did not deprive the District Court of jurisdiction.

A. The Jurisdictional Evidence.

The plaintiffs offered documentary evidence before the Magistrate Judge dealing with activity by ORIA and its members to convince foreign governments, foreign rug trade associations, and one domestic rug retailers' association not to provide financial assistance to the CGI trade shows. For example, ORIA wrote to the secretary of the Carpet Export Promotion Council of India ("CEPC") that in deciding whether or not to co-sponsor CGI's November 1993 Chicago trade show, the CEPC should consider that doing so would "possibly jeopardize a very friendly and prosperous relationship" between Indian rug manufacturers and American importers. (JA.92). In addition, defendant Hodges (the president of defendant Pande Cameron & Co. of New York, an importer/wholesaler) wrote to the chairman of the CEPC, expressing his opinion that the CGI 1993 show was "destined for failure," asking for the chairman's "comments and observations in lending CEPC support to this show," and requesting "the names of those exporters from India who plan on exhibiting." With respect to this last request, Hodges wrote: "These would be exporters, I can assure you we would avoid in any future business discussions." (JA.93). There is no evidence in this record that CEPC furnished Hodges with these names.

CGI planned another trade show in Washington, DC in August 1994. In March of that year, defendant Newman (the president of defendant Noonoo Rug Co.) wrote to the vice-chairman of the Export Promotion Bureau of Pakistan ("EPB") and the Pakistan Carpet Manufacturers and Exporters Association ("PCMEA") regarding this trade show, urging the PCMEA and the EPB "not to encourage nor support the `renegade' activities and selfish motives of a few Pakistani trader/exporters and their American retail counterparts." Newman also noted that "[t]o do so would be to continue on the road leading to ill will and chaos." (JA.94-95). The PCMEA subsequently made efforts toward conciliation with ORIA. Its vice chairman wrote to ORIA

6

informing it of PCMEA's decision not to officially participate in the Washington Fair being held in August that year, and of its request that the EPB not "give any facility to" the participants. He reiterated that "no manner of encouragement or patronage" would be provided by the Association to any firm desiring to participate in the fair. (JA.96).

On March 23, 1994, Hodges, acting in his capacity as ORIA president, wrote to the president of the Oriental Rug Retailers Association ("ORRA"), a United States trade association, regarding the August 1994 CGI trade show. He stated:

> Rumor has it that the ORRA has been approached by CGI to cosponsor this function. I think you are well aware of our sentiments regarding the purpose of this trade fair in undermining existing channels of distribution which have proven to be successful to all of us over the years. We would naturally hope that the ORRA would not entertain any thoughts whatsoever in being involved and therefore lending credence to[CGI].

(JA.106). Hodges further noted his belief that politicians directly involved with a child labor bill sponsored by Senator Harkin, a subject high on ORIA's lobbying agenda, would be invited to attend the CGI trade show. Hodges expressed fear that "all of our efforts in dealing with the Harkin Bill and responsibly trying to address child labor could be undone by any `loose cannons' developing their own game plan." He concluded with the request that "through your leadership, . . . the ORRA take a long and very close look at the negative ramifications in lending your name to this very damaging endeavor." Apparently after interim contact with ORRA, Hodges again wrote ORRA's president on March 28, 1995, expressing his sentiments "that Emmert Elsea's attitudes toward wholesalers[are] . . . both incorrect and unhealthy," and of his concern with Elsea's approach toward eradicating child labor.

Significantly, the minutes of an April 1994 ORIA membership meeting show that "Dan and Gene," presumably a reference to Dan Hodges and Eugene Newman, had contacted the ORRA and obtained its promise

7

not to endorse the August trade show as a group. The minutes also reflect that "Gene" "urged the [ORIA] members who import from Pakistan, India and other countries to write the proper Export Promotion authorities in those countries and advise them not to participate in this show." The minutes of an August 1994 ORIA meeting reflect that this statement was amended to read "Gene Newman suggested that the individual members and not the organization" engage in this letter writing campaign.

In addition, the plaintiffs also offered one piece of documentary evidence intended to show that the defendants were boycotting domestic retailers and foreign manufacturers who supported the trade shows. These were handwritten notes dated May 25, 1994, taken by an unidentified rug retailer in Virginia, of a telephone conversation between the retailer and a representative of defendant Kelaty Rugs International. The notes describe the importer's representative as "irate," and record the retailers' fear that because of his cooperation with Elsea,"we will not be able to get rugs from anyone." Most significantly, the unidentified retailer stated "We are being dealt with from both ends. i.e., cannot get supplied in U.S.[,] also those who supply us from overseas will be boycotted by importers." The Magistrate Judge did not credit this evidence because it was unclear who wrote these notes. When the plaintiffs later objected to the Magistrate Judge's R&R before the District Court, they offered the declaration of someone named William Hirsch, in which Hirsch purported to authenticate these notes as his own. Although the defendants contend that this declaration was not submitted before the magistrate, plaintiffs claim it was submitted and the magistrate simply disregarded it. (Appellants' Reply Br. at 3-4).

Finally, CGI offered a declaration of Emmert Elsea dated July 17, 1997. Elsea made the following pertinent representations:

> 4. Joseph Zarnigin of Zarnigin Rugs, an ORIA member located in New York, informed me and Anne Williams that he would participate in the 1993 trade show except that doing so would jeopardize his membership in and benefits from ORIA.

5. DCC, Inc., an ORIA member located in New York, said he would purchase space in the 1993 trade show, but later refused to do so because ORIA strongly opposed the trade show.

6. Rug News[, a trade magazine intended for retail readership,] refused to accept advertising for the 1993 trade show.

7. Decorative Rug[, a similar magazine,] withdrew its acceptance of CGI's advertising on the grounds that it would lose its ORIA customers if it allowed CGI to advertise. The publisher of Decorative Rug also stated that he was being pressured by ORIA to run unfavorable editorials concerning CGI.

8. Anadol Rugs, an ORIA member located in New York, executed a contract and paid a deposit for space in the 1994 trade show. The contract was not forged. Anadol cancelled [sic] its contract after its anticipated participation was revealed to ORIA, and, according to the president of Anadol, ORIA pressured it.

The Magistrate Judge recommended that the defendants' motion to dismiss for lack of subject matter jurisdiction be granted. He concluded that FTAIA governed the Court's subject matter jurisdiction and that the plaintiffs failed to establish jurisdiction under the Act because they failed to prove that the defendants' conduct had a direct and substantial effect on United States domestic commerce. (R&R 10-11.)

B. Additional Jurisdictional Evidence
Offered To the District Court.

The plaintiffs subsequently filed objections to the Magistrate Judge's report and recommendation with the District Court. In so doing, both they and the defendants submitted additional evidence to that Court for its consideration. For example the plaintiffs offered additional evidence intended to show that ORIA and the individual rug importers had pressured independent trade publications to reject advertising for the trade show. They offered Elsea's contemporaneously written notes of a September 1993

9

telephone conversation with Ron O'Callaghan of Decorative Rugs magazine, an independent trade publication, in which he recorded that O'Callaghan "rejected his acceptance of " CGI's advertisements for the 1993 trade show. Elsea reported that O'Callaghan stated that if he printed the ads, ORIA and other importers would quit advertising, and that ORIA opposed the show and had pressured Decorative Rug magazine to run editorials against it. In response, the defendants offered a certification from O'Callaghan in which he denied that he made such statements, and specifically stated that none of the importers ever contacted him and threatened to quit advertising in his magazine if it accepted advertisements from Elsea for his Chicago trade show.

The plaintiffs also offered a letter from an advertising consultant reporting that when the consultant tried to place an advertisement in Rug News, another independent trade publication, she was told by Rug News official Les Stroh that the advertisement would not be accepted because the trade show would "damage the oriental rug importers." (JA.127). In response, the defendants offered excerpts from a deposition of Stroh, in which he testified that he never received any recommendation from ORIA not to accept ads from manufacturers. Stroh also denied ever having any conversations with anyone from ORIA pertaining to the acceptance or rejection of advertisements from manufacturers. (JA. 178–81).

The plaintiffs also offered the minutes of a December 1993 ORIA executive board meeting, at which the board discussed CGI's November 1993 Chicago trade show. The minutes report a discussion concerning a memorandum that would be sent to all members about the operations of CGI, "which held a trade fair in Chicago last November where they had cut out the role of the importer in the chain of distribution." Lee Harounian, an ORIA board member, suggested that ORIA members "boycott" the manufacturers participating in the show. The executive board ultimately decided that this memorandum should not go to all members but to the board members only.

In addition, Elsea submitted a supplemental declaration in which he recounted that the owner of Istanbul Grand Bazaar ("IGB"), a company that both manufactures rugs in

10

Turkey and imports them into the U.S. (and therefore is a member of ORIA), expressed interest in participating in CGI's 1994 trade show, but said he would not be the only ORIA member to do so. Elsea asserted that he informed IGB's owner that another Turkish importer/manufacturer and ORIA member, Anadol Rugs, also was participating. Subsequently, Elsea claimed, he received a fax from Anadol Rugs informing him that Anadol "had received a fax from ORIA concerning [its] participation in the trade fair." As a consequence, Anadol was "canceling" its participation in the trade fair. The fax, also offered as evidence, stated that Anadol "ha[s] no intentions whatsoever to attend this exhibit[ion]." The fax further admonished CGI to "please rectify this matter immediately, writing to [ORIA] that it was a mistake on your part." Neither Anadol nor IGB participated in the trade show.

The plaintiffs also offered evidence of ORIA's historical efforts to prevent foreign manufacturers from selling directly to U.S. retailers. In 1992, Pakistani rug manufacturers sold some rugs directly to Bloomingdale's department store, an American retailer. In September of that year, following this sale, then-ORIA president (and defendant) Isaac Etessami wrote to the Pakistani Minister of Commerce complaining of this practice, with emphasis on EPB's subsidization of Bloomingdales' promotion. The letter reminded the Pakistani minister of the "traditional, established and respected chain of distribution" in the United States, to wit, "MANUFACTURER/EXPORTER-- IMPORTER/WHOLESALER -- RETAILER -- CONSUMER." The letter also admonished Pakistani exporters to concentrate their promotion sales efforts on American importers "and not attempt to involve themselves with retailers, who are the importers' customers." (Emphasis in original). The lengthy letter concluded with the exhortation: "Work with the American importer in promoting your rugs and not around him."

Finally, the plaintiffs offered a memorandum from the president of ORRA addressed to the ORRA board, written shortly after the president received the March 23, 1994 letter from then-ORIA president Hodges regarding potential ORRA sponsorship of CGI's 1994 trade fair. The memo read in part:

11

> Over the past year ORRA has made significant progress in mending fences with its sister organization ORIA. . . . Last year a letter went out under my signature that effectively distanced ORRA from [CGI]. . . . The building process is slow . . . . . and it will come to a grinding halt, in my opinion, if we even entertain the notion of joining forces with [CGI].
>
> Both Dan Hodges and Gene Newman have gone on record requesting that ORRA continue to disassociate itself from Mr. Elsea's efforts.

In response, the defendants offered excerpts from the deposition of the ORRA president, in which she testified that nobody "at ORIA [told her] . . . that moving away from an affiliation with another trade fair would improve relations."

C. Subsequent Proceedings.

The District Court, "having conducted de novo review of " the Magistrate Judge's recommended disposition, the parties' subsequent submissions, and the underlying record, but not of the additional evidence submitted to the District Court after the issuance of the Magistrate Judge's initial report and recommendation, remanded the matter to the Magistrate Judge, so that the arguments raised in plaintiffs' objections could be adequately evaluated.

On remand, the Magistrate Judge considered CGI's "additional legal arguments," but did not consider the additional evidence submitted to the District Court. After consideration of the arguments, the Magistrate Judge issued a supplemental report and recommendation affirming his original report. The District Court subsequently adopted both reports and dismissed the complaint for lack of subject matter jurisdiction.

II.

Subject matter jurisdiction in this case rests, if at all, on 28 U.S.C. S 1337(a), which states that "[t]he District Courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating

12

commerce or protecting trade and commerce against restraints and monopolies." On appeal to this Court, the primary question presented is whether the District Court possessed subject matter jurisdiction over the plaintiffs' antitrust claims in light of the FTAIA, which limits the applicability of the Sherman Act in certain circumstances. In addition to fervently disputing the plaintiffs' arguments, the defendants offer two additional arguments as alternative bases on which this Court might affirm the District Court's dismissal of this action. First, they argue even assuming the FTAIA does not apply, the plaintiffs have not established subject matter jurisdiction under the Sherman Act. Second, they argue that the plaintiffs do not have the "antitrust standing" needed to pursue their claims.

A.

We first turn to the relevant provisions of the "inelegantly phrased" FTAIA.4 This statute, when parsed, states two requirements about when the Sherman Act, which falls within the jurisdictional ambit of 28 U.S.C. S 1337, applies. First, the initial sentence of Section 6a, along with its "import trade or commerce" parenthetical, provides that the antitrust law shall apply to conduct "involving" import trade or commerce with foreign nations (provided, of course, that jurisdiction is found to exist under the Sherman Act itself). 15 U.S.C. S 6a. Second, Section 6a(1)(A) states that the antitrust laws shall not apply to all other conduct involving trade or commerce with foreign nations unless such conduct has a direct, substantial, and reasonably foreseeable effect on (a) domestic trade or commerce, or (b) import trade or commerce with foreign nations. 15 U.S.C. S 6a(1)(A).

Here, the defendants attack subject matter jurisdiction "in fact," meaning they dispute the existence of certain jurisdictional facts alleged by the plaintiffs. When a defendant attacks subject matter jurisdiction "in fact," as opposed to an attack on the allegations on the face of the

_____

4. See United States v. Nippon Paper Indus. Co., Ltd., 109 F.3d 1, 4 (1st Cir. 1997).

13

complaint, the Court is free to weigh the evidence and satisfy itself whether it has power to hear the case. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff 's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. In addition, the burden of proving the existence of subject matter jurisdiction lies with the plaintiff. Id. The parties appear to agree that under the Mortensen framework for analyzing factual challenges to subject matter jurisdiction, this Court reviews the District Court's and Magistrate Judge's findings of jurisdictional facts for clear error.

In their complaint, the plaintiffs in this case allege a broad horizontal conspiracy among United States rug importer/wholesalers to restrain the domestic rug trade between foreign manufacturers and United States domestic retailers at plaintiffs' trade shows, and to restrain sales between foreign manufacturers and such retailers on buying trips abroad. They charge that the defendants' conduct restrained United States commerce, alleging threats not to purchase rugs from any manufacturer that participates in the plaintiffs' trade shows; threats not to purchase rugs from any manufacturer that sells rugs to any retailer on a buying trip; reducing or ceasing purchases of rugs from manufacturers that participate in plaintiffs' trade fairs or sell to retailers on buying trips; threats to retaliate, including expulsion from the association, against any ORIA member that participates in the plaintiffs' trade shows; and inducing the Carpet Export Promotion Council of India, the Export Promotion Board of Pakistan, and the Pakistan Carpet Manufacturers and Exporters Association not to subsidize the participation of manufacturers from those countries in the plaintiffs' trade shows.

Addressing the impact of the FTAIA to this case, the Magistrate Judge first determined that the plaintiffs were themselves not importers and, therefore, were not eligible for the "import trade" exception. The Magistrate Judge then addressed whether the evidence in the record supported a finding of subject matter jurisdiction under the statute.

14

The Magistrate Judge apparently found that the evidence plaintiffs introduced to back up their allegations was credible only with respect to the charge that they "attempt[ed] to induce or induc[ed] the Carpet Export Promotion Council of India, the Export Promotion Board of Pakistan, and the Pakistan Carpet Manufacturers and Exporters Association not to subsidize the participation of manufacturers from those countries in the plaintiffs' trade fairs." The Magistrate Judge held that this did not describe conduct having a "direct" and "substantial" effect on import trade or commerce.5 Accordingly, the Magistrate Judge and, subsequently, the District Court, held that this case fell under the FTAIA's exemption from the antitrust laws, and that subject matter jurisdiction was therefore lacking.

The District Court and Magistrate Judge both ignored significant additional evidence offered by the plaintiffs to back up their other allegations. Under 28 U.S.C.S 636 and Federal Rule of Civil Procedure 72(b), where a District Court reviews a Magistrate Judge's report and recommendation regarding a dispositive motion, the Court has discretion whether to consider additional evidence not presented to the Magistrate Judge.6 See United States v.

_____

5. The parties did not place in contention the issue of whether the challenged conduct had a "reasonably foreseeable" effect on import or domestic commerce. See 15 U.S.C. S 6a(1)(A).

6. Title 28 United States Code, section 636(b) states, in relevant part, that after a District Court receives objections to a Magistrate Judge's report, the District Court:

> shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

Similarly, Rule 72(b) states, in relevant part, that upon receiving written objections to a Magistrate Judge's report, the District Court:

> shall make a de novo determination on the record, or after additional evidence, of any portion of the magistrate judge's disposition. . . . The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

15

Raddatz, 447 U.S. 667, 673–74 (1980). Moreover, it has, on occasion, been held that it is within the discretion of a district court reviewing a Magistrate Judge's report and recommendation de novo to ignore newly proffered evidence because the evidence is untimely, and the proponent of the evidence has provided no reason why he did not present it before the Magistrate Judge. See Callas v. Trane CAC, Inc., 776 F. Supp. 1117, 1119 (W.D. Va. 1990), aff 'd, 940 F.2d 651 (4th Cir. 1991); see also Freeman v. County of Bexar, 142 F.3d 848, 852 (5th Cir. 1998) (District Court has "obligation to review de novo the actual evidence on objected-to findings, but the District Court should not be compelled to ignore that the parties had a full and fair opportunity to present their best evidence to the magistrate judge").

The District Court's opinion remanding the matter back to the Magistrate Judge, however, is troublesome. The District Court noted that it had been presented with "additional arguments, not additional evidence permissible under Fed. R. Civ. P. 72(b)." It is not clear from this statement that the District Court even realized that plaintiffs had presented additional evidence. In any event, the Court did not exercise its discretion under 18 U.S.C. S 636 and Rule 72(b) not to consider that evidence. Additional evidence, however, plainly was presented."At least, the statute's authority for the court `to receive further evidence' in the course of de novo review of a magistrate judge's decision requires that discretion must be exercised." Freeman, 142 F.3d at 852. We believe that in the context of a challenge to subject matter jurisdiction which can be raised at any time during the course of the litigation, the District Court should have considered the additional evidence. The evidence was significant and was before the Court when the Magistrate Judge sent up his first report and recommendation. Yet without explanation, the District Court ignored the additional evidence and remanded the matter to the Magistrate Judge to consider only the additional arguments of the parties.

The Magistrate Judge held that this case did not fall into the FTAIA's parenthetical exclusion, i.e., did not"involve" import trade or commerce, because the plaintiffs in this

16

case were not importers, but merely brokers. As plaintiffs observe, this is plainly an inaccurate reading of the FTAIA. It is an incorrect focus on the plaintiffs' function rather than the defendants' conduct. The FTAIA's exemption from the Sherman Act focuses on the latter's application to "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. S 6a (emphasis added). The implication that the Sherman Act provisions "apply to import trade and import commerce is unmistakable." Eskofot A/S v. E.I. DuPont de Nemours & Co., 872 F. Supp. 81, 85 (S.D.N.Y. 1995). The proper inquiry was therefore whether the alleged conduct by the defendants "involved" import trade or commerce, not on whether the plaintiff 's conduct, which is not being challenged as violative of the Sherman Act, "involved" import trade or commerce.

Congress enacted the FTAIA for the purpose of facilitating the export of domestic goods by exempting export transactions that did not injure the United States economy from the Sherman Act and thereby relieving exporters from a competitive disadvantage in foreign trade. See 1982 U.S.C.C.A.N. 2431, 2432; Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 n.23 (1993). Thus, the Act's declaration of purpose states "[i]t is the purpose of this act to increase United States exports of products and services by," inter alia, "modifying the application of the antitrust laws to certain export trade." Pub. L. No. 97-290, 1982 U.S.C.C.A.N. (96 Stat.) 1234 (codified at 15 U.S.C. S 4001(b)). The Act specifically excludes the importation of goods and domestic commerce from its antitrust exemption. "The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 n.2 (1986).

> Since the FTAIA clearly states that the Sherman Act is not applicable to trade or commerce other than import trade or import commerce, the Sherman Act continues to apply to import trade and import commerce, thereby rendering the FTAIA's requirement of a direct, substantial, and reasonably foreseeable effect inapplicable to an action alleging an impact on import trade and import commerce.

17

54 Am. Jur. 2d S 18, at 77 (footnote omitted). Here, the plaintiffs' activities involved both buying trips abroad where manufacturers sold rugs to American retailers for importation into this country, and trade show sales in the United States where manufacturers sold rugs to American retailers. Therefore, the defendants intended their alleged conduct to subvert commercial activities that solely impacted domestic commerce. Plaintiffs charge that defendants engaged in a course of activity designed to ensure that only United States importers, and not United States retailers, could bring oriental rugs manufactured abroad into the stream of American commerce.

Even if this Court considered only the evidence presented before the Magistrate Judge, the latter erred in ruling that the defendants' conduct did not "involve import trade or commerce." The defendant association identifies itself as an organization of "rug importers"; the individual defendants are its officers and directors. Admittedly, the FTAIA differentiates between conduct that "involves" such commerce, and conduct that "directly, substantially, and foreseeably" affects such commerce. To give the latter provision meaning, the former must be given a relatively strict construction. The evidence before the Magistrate Judge dealt largely with efforts to prevent Indian and Pakistani export boards from giving financial assistance to CGI or to manufacturers who wanted to participate in CGI's trade shows. It also dealt with efforts to convince ORRA, the trade association of United States rug retailers, from sponsoring the shows. These are activities that arguably did not, standing alone, "involve" import trade or commerce, but that did relate directly to them.

Elsea's declaration, however, makes allegations that ORIA pressured Zarnigan Rugs, DCC, Inc., and Anadol Rugs, Inc., themselves ORIA members who were involved both in importing and foreign manufacturing, to refrain from participating in CGI's trade shows. This evidence was uncontested before the Magistrate Judge. These allegations directly involved both import and domestic commerce. 7

_____

7. The Magistrate Judge noted that many of the allegations in Elsea's declaration are based only on `information and belief " rather than on

Significantly, Mortensen makes clear that because, in the Sherman Act context, jurisdictional facts are often closely intertwined with the merits of the claim, "it is incumbent upon the trial judge to demand less in the way of jurisdictional proof than would be appropriate at a trial stage." 549 F.2d at 892. Under this standard, the uncontested evidence in Elsea's declaration alone arguably should have been sufficient to remove the FTAIA as an obstacle to jurisdiction. Accordingly, the District Court committed clear error in ordering a dismissal of the action at this stage of the proceedings.

Furthermore, the foregoing conclusion finds even stronger support when one considers all of the evidence submitted before both the Magistrate Judge and the District Court, especially in light of Mortensen 's less stringent evidentiary standard. The plaintiffs have offered evidence that defendants took steps to: (1) prevent foreign manufacturers from selling to United States retailers, (2) prevent at least one American retailer from purchasing rugs directly from foreign manufacturers, (3) prevent foreign governments and trade associations from sponsoring trade fairs at which retailers could purchase directly from foreign manufacturers, and (4) prevent an American rug retailers' trade association from sponsoring the trade fairs. 8

Finally, the evidence offered by plaintiffs (including the evidence offered after the Magistrate Judge's initial report issued) reveals that the defendants' alleged conduct had its intended negative effect on CGI's trade shows and,

_____

personal knowledge, but did not specify what effect this had on the weighing of the allegations. We believe that the lower evidentiary standard applied to challenges to summary judgment under Mortensen required the Court to credit undisputed evidentiary contentions even when based on "information and belief." Moreover, the more relevant contentions in Elsea's declaration do appear to have been based on his personal contact with entities such as Zarnigan, DDC, and Anadol.

8. The plaintiffs also contend that the defendants tried to dissuade independent rug trade publications from accepting advertising for CGI's trade fairs. The evidence regarding these efforts is heavily disputed in the
record, however, and therefore we do not conclude that the lower courts' rejection of this evidence was clearly erroneous.

consequently, had the effect of protecting the defendants' import and wholesale business. Accordingly, the evidence, taken as a whole, is sufficient to support the plaintiffs' allegations that the challenged conduct "involved" import trade or commerce. The crux of their case involves conduct in the United States, not conduct abroad. We hold that these activities are not the type of conduct Congress intended to remove from our antitrust jurisdiction when it enacted the FTAIA. The FTAIA therefore does did not divest the District Court of subject matter jurisdiction over the plaintiffs' claims.

B.

The defendants next argue that even assuming the FTAIA does not divest the federal courts of subject matter jurisdiction over the plaintiffs' claims, the District Court nevertheless lacked jurisdiction under the Sherman Act itself. They contend that the plaintiffs have failed to demonstrate that the defendants' alleged conduct had a sufficient effect on United States interstate commerce. Because the parties did not include the defendants' motion to dismiss for lack of subject matter jurisdiction in the record filed with this Court, it is not clear to us that this argument was presented to the District Court or Magistrate Judge. However, the defendants argue that the test for Sherman Act jurisdiction is identical to the "substantial and direct effects" test under the FTAIA, which the District Court did consider. For this reason, and because an appellate court is always free to review the existence of subject matter jurisdiction, we will resolve the procedural doubt in favor of the defendants and address this argument.

The defendants contend that the plaintiffs must demonstrate a "substantial" effect on our domestic commerce to support the exercise of jurisdiction under the Sherman Act. They place primary reliance for this proposition on Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 n.23 (1993). By contrast, the Department of Justice, as amicus curiae, focuses on language in other cases that all the plaintiffs need show is that the restraint either interfered with the sale of rugs in interstate

20

commerce or had a "not insubstantial" effect on interstate commerce to invoke Sherman Act jurisdiction.

The plaintiffs pose a different argument in support of Sherman Act jurisdiction. They contend that their allegations of a horizontal group boycott are subject to a per se analysis, rather than analysis under the rule of reason. In adjudicating a per se claim on its merits, effects on commerce should be presumed and a market power inquiry is unnecessary. The plaintiffs extend this reasoning to argue that where a per se claim is at issue, this presumption of market impact holds equally true for purposes of establishing subject matter jurisdiction.

Traditionally, horizontal group boycotts are generally judged under a per se analysis. See Klor's Inc. v. Broadway–Hale Stores, 359 U.S. 207 (1959). The Supreme Court, however, has curtailed the application of the per se analysis in cases alleging concerted refusals to deal in recent years. Nevertheless, the plaintiffs claims appear to fall within that class of cases that still enjoys per se analysis. They claim that the conspiring importer/wholesaler firms (themselves competitors, making this a horizontal boycott) engaged in a "naked" restraint by agreeing not to deal with manufacturers who sold to United States retailers directly, or with such retailers who purchased directly from manufacturers. See Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600 (1914); H ERBERT HOVENKAMP, ANTITRUST LAW, P 2203 (1999). According to one commentator, a truncated antitrust analysis remains applicable to "concerted refusals that upon brief inspection are unlikely to have any purpose other than the reduction of market output and attendant price increases. In that case, condemnation is in order without any inquiry into [market] power." ANTITRUST L AW P 2203a.

Similarly, this Court has stated,

> per se boycott cases usually contain three elements: "denial of something a competitor needs to compete effectively, defendants with a dominant position in the relevant market, and the absence of any plausible contention that the challenged behavior would `enhance overall efficiency and make markets more competitive.' "

21

Rossi v. Standard Roofing, Inc., 156 F.3d 452, 463 (3d Cir. 1998) (quoting P. AREEDA & H. HOVENKAMP, ANTITRUST LAW P 1510 (Supp.1997) (quoting and interpreting Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 294-95 (1985))). The defendants' conduct complained of fits this description. It can be characterized as having a "pernicious effect on competition" and lacks any redeeming virtue. See Rossi, 156 F.3d at 461 (quoting Northern Pac. Ry. v. United States, 356 U.S. 1, 5 (1958)).

Although "[t]he mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are intentionally anticompetitive," id. at 463 (quoting Northwest Wholesale Stationers, 472 U.S. at 295, 298), it appears that the refusal to deal here at issue is predominantly anticompetitive. If the plaintiffs can prove at trial that the alleged conspiracy actually exists, the anticompetitive effect of such a conspiracy would be "immediately obvious." FTC v. Indiana Federation of Dentists, 476 U.S. 447, 458 (1986). There appears to be no reason for the defendants' action other than to protect the wholesaler/importer's role in the chain of distribution.

The defendants correctly observe that under Supreme Court precedent, "the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." Indiana Federation of Dentists, 476 U.S. at 458. Market power is the power to control prices and exclude competition. See American Tobacco Co. v. United States, 328 U.S. 781, 789 (1946). However, "when the defendants are not engaged in any significant integration of production or distribution, and the only rationale for the restraint is the elimination of additional, lower-cost, higher quality, or more innovative output from the market," this rationale "implies the existence of market power." ANTITRUST LAW P 2203a. Plaintiffs have not offered specific evidence to show what portion of the United States market for the importation and wholesale distribution of oriental rugs was affected by defendants' actions or the potential market impact of their lost trade show sales. The District Court and Magistrate Judge relied

22

heavily on this absence of evidence in dismissing their claims. Nevertheless, because the evidence offered by the plaintiffs indicates that the defendants' conduct had its intended effect of undermining the trade shows, and that its only purpose was to eliminate competition in the United States, this raises a strong inference that ORIA and its member rug importer/wholesalers possessed some degree of market power. Accordingly, per se treatment appears appropriate here.9

Moreover, the Supreme Court noted the broad reach of the Sherman Act and has made clear that a plaintiff 's burden of establishing effects on commerce sufficient to confer jurisdiction under the Sherman Act is not great. The jurisdictional requirement of the Act "may be satisfied under either the `in commerce' or the `effect on commerce' theory." McLain v. Real Estate Bd. of New Orleans, 444 U.S. 233, 242 (1980). McLain controls when subject matter jurisdiction over domestic conduct is at issue. We reject the defendants' reliance on Hartford Fire, because it dealt exclusively with the extraterritorial applicability of the Sherman Act to wholly foreign conduct. The instant case deals primarily with conduct in the United States, namely concerted action by United States importer/wholesalers directly to affect the domestic retail oriental rug market. Accordingly, . . ." All the plaintiffs need demonstrate is "either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other activity demonstrably in interstate commerce." Id.; see also Mortensen, 549 F.2d at 896.

No one claims that the conduct here at issue is"local in nature," and therefore no "effects" test even comes into play. Instead, we focus on whether the plaintiffs' have proffered evidence that the defendants' anticompetitive activity is itself in interstate commerce. It is clear from the uncontradicted evidence presented that requisite nexus to

_____

9. The District Court held that ORIA was a "professional organization," much like the Indiana Federation of Dentists, and for this reason plaintiffs' claims were subject to a rule of reason analysis. This conclusion was clearly erroneous, and the defendants do not even attempt to defend it on appeal.

interstate commerce exists here. ORIA is headquartered in New Jersey; several of the defendant wholesalers/importers are located in New York; the defendants wrote to the Rhode Island-based president of ORRA to dissuade that organization from co-sponsoring the trade shows; at least one retailer who was pressured not to associate with CGI is based in Virginia; Elsea and CGI are based in Virginia; and the trade shows took place in Chicago, Illinois and Washington, DC. In these circumstances, the plaintiffs therefore need not quantify the actual effect defendants' conduct had on interstate commerce to support federal jurisdiction. See McLain, 444 U.S. at 243; Fuentes v. South Hill Cardiology, 946 F.2d 196, 199-200 (3d Cir. 1991); see also Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 331 (1991).

Thus, because the plaintiffs have introduced evidence sufficient to show that the challenged conduct actually occurred in interstate commerce, we conclude that subject matter jurisdiction exists over plaintiffs' Sherman Act claims.

C.

Finally, the defendants contend that even if subject matter jurisdiction over the plaintiffs' claims exists, this Court should nevertheless affirm the dismissal of those claims because the plaintiffs lack antitrust standing to bring an action under the Sherman Act. Specifically, they contend that antitrust standing is lacking because the plaintiffs are merely brokers, and are not themselves the defendants' competitors or consumers in the relevant market.10 Their argument relies on a recent decision of this Court in Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178 (3d Cir. 1997).

Stated briefly, SmithKline Beecham ("SB") manufactured

_____

10. The defendants first raised this argument before the District Court in their memorandum opposing the plaintiffs' objection to the magistrate's initial report. However, the Magistrate Judge did not rely on this argument on remand, and the District Court did not rely on it in adopting the Magistrate Judge's reports.

24

a hepatitis-B vaccine. Traditionally, it had sold the vaccine to pharmacists, who in turn sold the vaccine to nursing homes. SB, however, entered into a contract with Barton & Pittinos ("B&P") under which B&P distributed marketing materials about the vaccine to and solicited orders from nursing homes. B&P would then pass the orders to a third company, General Injectables and Vaccines, Inc. ("GIV"), which would purchase the vaccine from SB, resell it to the nursing homes, thus fulfilling the orders. The pharmacists became upset that SB had chosen another manner of vaccine distribution, and complained to SB. As a result, SB terminated its arrangement with B&P and GIV. B&P sued SB for conspiring with the pharmacists to restrain competition in the nursing home market for vaccine.

The Court dismissed the case, holding that B&P lacked antitrust standing to sue under the Sherman Act because its injury was not of a type the antitrust laws were designed to prevent.11 The parties apparently agreed, and the Court acknowledged, that to have antitrust standing, B&P must have been either a consumer or a competitor in the relevant market. The Court focused its inquiry on whether B&P was a "competitor." It held that, although the SB/B&P/GIV arrangement, taken as a whole, competed directly with the pharmacists, B&P was not by itself in competition with them because B&P lacked the license required to resell the vaccine which GIV had provided. See id. 182-83. "Consequently, there was no cross-elasticity of demand between the pharmacists' offering and B&P's offerings; no

_____

11. The Court noted that the existence of "antitrust injury" was one of several factors that go into a determination regarding antitrust standing. The other factors are:

> the causal connection between the antitrust violation and the harm
> to the plaintiff and the intent by the defendant to cause that
harm,
> with neither factor alone conferring standing; . . . the directness
of
> the injury, which addresses the concerns that liberal application
of
> standing principles might produce speculative claims; . . . the
> existence of more direct victims of the alleged antitrust
violations;
> and . . . the potential for duplicative recovery or complex
> apportionment of damages.

Id. at 181.

matter how much the pharmacists raised the price of the package of the goods and services that they offered, the nursing homes could not have switched to B&P." Id. at 183. Thus, the Court concluded, "advertisers and brokers of a good or service are not competitors of companies that actually supplied the good or service." Id. at 184.

The defendants claim that the plaintiffs' trade shows are no different from B&P's role as a marketer and solicitor of orders. We disagree. First, as the plaintiffs explain quite thoroughly in their reply brief to this Court, Barton & Pittinos arguably rests on an overstated premise. The Court's conclusion in Barton that in order to suffer antitrust injury, one must be either in competition with the defendant or a consumer of its goods or services, if construed as an absolute (which arguably it need not be), may in some circumstances lead to results that conflict with Supreme Court and other precedent.12  Indeed, this Court recently acknowledged that although generally only competitors and consumers will suffer antitrust injury (an essential component of antitrust standing), such injury may in some circumstances inhere where the harm is " `inextricably intertwined' with the defendant's wrongdoing." Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 926 & n.8 (3d Cir. 1999) (quoting Gulfstream III Assoc., Inc. v. Gulfstream

---

12. In Associated General Contractors of California, Inc. v. California State
Council of Carpenters, the Court articulatedfive factors that courts should consider in analyzing the existence of antitrust standing. 459 U.S. 519, 545 (1983). This Court has summarized them as follows:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause harm,
> with neither factor alone conferring standing; (2) whether the plaintiff 's alleged injury is of the type for which the antitrust laws
> were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the
> potential for duplicative recovery or complex apportionment of damages.

In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1163 n.9 (3d Cir. 1993).

Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993)), cert. denied, 120 S. Ct. 844 (2000).

Regardless, even assuming that the plaintiffs in this case could have standing only if they compete with the defendants, Barton & Pittinos is distinguishable. Their trade shows and buying trips can most certainly be categorized as in competition with the rug importer/wholesalers. Elsea and CGI, by themselves, offered an alternative avenue of distribution to that offered by the wholesaler/importers. If the wholesaler/importers raised the prices at which they sold oriental rugs to domestic retailers, those retailers could go to CGI's trade shows and purchase rugs there directly from manufacturers. In other words, there is a cross-elasticity of demand[13] between the plaintiffs' offering and the defendants' offering. The plaintiffs' trade shows offered retailers (and manufacturers) certain organizational efficiencies that previously could be provided only by distributing rugs through wholesaler/importers. They allowed the rugs to be brought across the ocean and made available to retailers. In so doing, the plaintiffs relieved retailers of the burdensome task of locating and contacting manufacturers abroad, dealing with a web of import and customs regulations, and surmounting potential cultural obstacles to doing business with Indian, Pakistani, Turkish, and possibly other foreign rug manufacturers.

Indeed, as the plaintiffs explain, the instant case bears a striking similarity to the facts in Crimpers Promotions Inc. v. Home Box Office, 724 F.2d 290 (2d Cir. 1983), cert. denied, 467 U.S. 1252 (1994). In Crimpers, the plaintiff organized a trade show at which television programming producers could sell programs directly to television stations, instead of having to sell through distributors first. The plaintiff charged that then distributors conspired to sabotage the trade show by boycotting potential participants. The Court of Appeals for the Second Circuit, in an opinion written by Judge Friendly, held that the plaintiff-trade show organizer

_____

13. Cross-elasticity of demand is defined as a relationship between two products, usually "substitutes for each other, in which a price change for one product affects the price of the other." Black's Law Dictionary, 7th ed.

27

had standing to bring a Sherman Act claim against the distributors. Judge Friendly held that organizer's injury was sufficiently direct to confer standing because"[i]t was endeavoring to forge a link in a chain of the sale of programming, to wit, direct contact between program producers and cable television stations, that would compete with defendants in their role as middlemen." Id. at 294.

We find Crimpers persuasive. Instead of facilitating the sale of television programming between producers and television stations, Elsea and CGI "endeavor[ed] to forge a link in a chain of the sale" of oriental rugs between foreign rug manufacturers and domestic rug retailers. That link competed directly with the traditional middlemen-- the rug importer/wholesalers. Moreover, the alleged injury to the plaintiffs was not merely an indirect or remote consequence of the defendants' actions, as might have been the case if the defendants' actions had put a rug manufacturer out of business, and someone who supplied materials to that manufacturer sued under the antitrust laws. See id. Rather, "injury to [the plaintiffs] was the precisely intended consequence of defendants' boycott," id., and is " `inextricably intertwined' with the defendant's wrongdoing," Steamfitters, 171 F.3d at 926 & n.8.

In addition, the defendants' contention that they did not compete with Elsea and CGI is belied by their action to, at the very least, dissuade foreign and domestic entities from contributing financial support to the plaintiffs' trade shows. There is no logical explanation for the defendants' assiduous and persistent effort to preserve their role in the chain of distribution other than their belief that they were threatened by the plaintiffs' activities. Accordingly, we reject the defendants' argument and hold that the plaintiffs have antitrust standing.

III.

In summary, we conclude that the FTAIA is inapplicable and that the District Court erred in dismissing this case. Further, the plaintiffs have offered sufficient evidence to demonstrate that the activities of the wholesale importers were intended to and adversely did impact on domestic

28

commerce by engaging in a course of anticompetitive conduct to ensure that only they, the importers, could bring oriental rugs manufactured abroad into the United States for distribution. We further hold that subject matter jurisdiction exists under the Sherman Act, and that the plaintiffs have antitrust standing. The order of dismissal of the District Court will be reversed and the case remanded to the District Court for further proceedings consistent with this opinion. Costs will be taxed against the appellee.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit