

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2002

# Turicentro v. Amer Airlines Inc

Precedential or Non-Precedential: Precedential

Docket No. 01-3135

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Turicentro v. Amer Airlines Inc" (2002). *2002 Decisions.* Paper 558.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/558

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed September 9, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3135

TURICENTRO, S.A.; CENTRO AMERICA TRAVEL
AGENCIE, LTD; NEGOCIOS GLOBO, S.A.; FRONTERAS
DEL AIRE, S.A., ON BEHALF OF THEMSELVES AND ALL
THOSE SIMILARLY SITUATED,
        Appellants

v.

AMERICAN AIRLINES INC.; CONTINENTAL AIRLINES INC.;
DELTA AIRLINES INC.; INTERNATIONAL AIR TRANSPORT
ASSOCIATION; UNITED AIRLINES INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 01-cv-00468
(Honorable J. Curtis Joyner)

Argued March 7, 2002

Before: SCIRICA and COWEN, Circuit Judges,
and RESTANI, Judge, United States Court of
International Trade*

(Filed: September 9, 2002)

_____

* The Honorable Jane A. Restani, Judge, United States Court of
International Trade, sitting by designation.


        ROBERT J. LaROCCA, ESQUIRE
          (ARGUED)
        Kohn, Swift & Graf
        One South Broad Street, Suite 2100
        Philadelphia, Pennsylvania 19107

         Attorney for Appellants

        GEORGE G. GORDON, ESQUIRE
          (ARGUED)
        JENNIFER R. CLARKE, ESQUIRE
        Dechert, Price & Rhoads
        4000 Bell Atlantic Tower
        1717 Arch Street
        Philadelphia, Pennsylvania 19103

         Attorneys for Appellee,
        American Airlines, Inc.

        ANN T. FIELD, ESQUIRE

Cozen & O'Connor
The Atrium
1900 Market Street
Philadelphia, Pennsylvania 19103

 Attorney for Appellee,
Continental Airlines, Inc.

FRANCIS P. NEWELL, ESQUIRE
Montgomery, McCracken, Walker
 & Rhoads
123 South Broad Street
Philadelphia, Pennsylvania 19109

 Attorney for Appellee,
Delta Airlines, Inc.

2

BERT W. REIN, ESQUIRE (ARGUED)
JOHN B. WYSS, ESQUIRE
Wiley, Rein & Fielding
1776 K Street, N.W.
Washington, D.C. 20006

BRUCE P. MERENSTEIN, ESQUIRE
Schnader, Harrison, Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103

 Attorneys for Appellee,
International Air Transport
Association

RICHARD J. FAVRETTO, ESQUIRE
Mayer, Brown, Rowe & Maw
1909 K Street, N.W.
Washington, D.C. 20006

 Attorney for Appellee,
United Airlines, Inc.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

At issue in this proposed class action is the extraterritorial scope of the Sherman Antitrust Act and its application in this case. The putative plaintiff class comprises certain foreign travel agents located outside the United States who allege major United States air carriers and their trade association illegally conspired to lower their sales commissions. The District Court held the Foreign Trade Antitrust Improvements Act, 15 U.S.C. S 6a, deprived it of subject matter jurisdiction, barring plaintiffs' claim. We will affirm.

I.

The major United States air carriers have delegated the licensing of travel agents to their trade association, the International Air Transport Association (IATA). 1 All travel

_____

1. IATA was founded in 1945 by the then-major global airlines, with the goals of promoting international air transportation and providing a

3

agents must have an IATA license to access reservation systems of United States-based airlines. In order to make a customer reservation, a travel agent can only enter the airline's electronic system with an IATA number. The travel agent's commission is automatically computed from a database in the airline's electronic system.

The Passenger Tariff Coordinating Conference is an IATA committee of airline company representatives who determine and fix the commission rates for travel agents. At the July 1999 Passenger Tariff Coordinating Conference meeting in Montreal, Canada, the Conference reduced commissions paid to IATA-accredited agents in Central America and Panama to a flat seven-percent rate. Previous commission rates had varied from country to country and ranged as high as eleven percent.

_____

means for collaboration. Section 412(b) of the Federal Aviation Act required the Civil Aeronautics Board to approve any agreement by air carriers it did not find "adverse to the public interest" or "in violation of the act." See Federal Aviation Act of 1958, 49 U.S.C. S 1382, amended by International Air Transportation Act of 1979, Pub. L. No. 96-192, 94 Stat. 35 (1979); see also CAB Order 80-4-113, Apr. 15, 1980 (describing the statute). In addition, S 414 of the Federal Aviation Act required the CAB to immunize from the antitrust laws transactions specifically approved or necessarily contemplated by an order of approval under S 412, provided such immunity was found to be required in the public interest. Id. Before the passage of the Airline Deregulation Act of 1978, such immunity attached automatically under S 414 upon approval. Id.

The CAB approved the organization of IATA in 1946 and granted indefinite approval to the IATA in 1955, after several one-year temporary approvals. IATA Traffic Conference Resolution , 6 CAB 639 (1945); CAB Order E-9305, June 15, 1955. Prior to 1979, agreements affecting foreign air transportation were approved and immunized by the CAB under broad public interest standards. After the passage of the Airline Deregulation Act, IATA amended its agreement, replacing its "Provisions for the Conduct of the IATA Traffic Conferences." See CAB Order 80-4-113 (describing the amendment).

The government has continued, more recently in the form of the Department of Transportation, to exercise regulatory oversight over the Provisions for the Operation of IATA Traffic Conferences. See generally DOT Order 88-3-67, Mar. 31, 1988.

4

On December 27, 1999, Grupo Taca, an alliance of the principal Central American airlines (and not a party to this suit), announced it would pay Central American travel agents only six-percent commissions. The next day, American Airlines announced it would pay six-percent commissions on tickets sold in Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, and Panama. Soon thereafter, Continental Airlines, United Airlines, and Delta Airlines followed suit.

Defendants American Airlines, Delta Airlines, and United Airlines are members of the Passenger Tariff Coordinating Conference. Defendant Continental Airlines is not. None of the airline defendants' representatives attended the 1999 Passenger Tariff Coordinating Conference meeting in Montreal. The minutes of the meeting reflect that "U.S.-based TC [Tariff Commission] Members were prohibited by their authorities from participating in such discussions and . . . were therefore not present for this part of the Agenda." The complaint alleges that during the Montreal meeting, an unidentified Passenger Tariff Coordinating Conference member proposed the reduction in commissions because new technology had streamlined the travel agents' traditional ticket-selling functions.

The named plaintiffs are two San Jose, Costa Rica travel agencies and two Managua, Nicaragua travel agencies, who filed suit on behalf of a class of similarly situated travel agencies. The complaint alleged that four major United States air carriers -- American Airlines, Continental Airlines, Delta Airlines, and United Airlines -- and IATA violated the Sherman Antitrust Act by conspiring to lower travel agents' commissions, a form of horizontal price fixing constituting a per se violation of the antitrust laws. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223-26 (1940). All four airline defendants are based in the United States, providing air passenger service between United States cities and locations within Latin America and the Caribbean (and elsewhere).

Plaintiffs contend defendants implemented the conspiracy in December 1999, when they began paying the lower six-percent commissions. The reduced commissions allegedly affected United States commerce because reservations on

the four defendant airlines account for a substantial portion of the business of Latin American and Caribbean travel agents. The complaint alleges the Passenger Tariff Coordinating Conference meeting in Montreal disguised a pre-arranged agreement by United States air carriers to create the illusion of non-involvement in the reduction of commission rates, in an attempt to avoid antitrust liability under United States laws. Plaintiffs contend defendants assisted in planning this agenda, were aware the vote would be taken and endorsed the reduced rates. Plaintiffs claim the loss of substantial commissions, causing one member of the proposed class to close its business. They

request treble damages.

The District Court dismissed the action under Fed. R. Civ. P. 12(b)(1), holding, "[P]laintiffs aver nothing from which this Court could find that Defendants' purported conspiracy caused any injury which was felt in the U.S. or which affected the American economy in any way." Turicentro, S.A. v. Am. Airlines, Inc., 152 F. Supp. 2d 829, 834 (E.D. Pa. 2001). The District Court did not address defendants' other arguments in support of dismissal. We must determine whether the District Court erred in finding the Foreign Trade Antitrust Improvements Act deprived it of subject matter jurisdiction.

II.

We have jurisdiction under 28 U.S.C. S 1291.

III.

Federal jurisdiction obtains for "any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." 28 U.S.C. S 1337(a). The Sherman Antitrust Act regulates "restraints and monopolies." Sections 1 and 2 of the Act provide:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . . Every

6

> person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . .

15 U.S.C. SS 1, 2.2

Federal courts have often disagreed about the extraterritorial scope of the Sherman Act. Various judicial constructions of the Act were developed over the last century. See Den Norske Stats Oljeselskap AS v. HeereMac VOF et al., 241 F.3d 420, 423-24 (5th Cir. 2001) ("Statoil") ("The history of this body of case law is confusing and unsettled."). Am. Banana Co. v. United Fruit Co., 213 U.S. 347 (1909) (Holmes, J.), was the first time the Supreme Court considered the extraterritorial application of the Sherman Act, holding it did not apply to conduct occurring outside United States borders. Id. at 357-58. Over time, the Supreme Court altered its approach, holding plaintiffs could bring Sherman Act claims against foreign defendants, provided some of defendants' conduct occurred within the United States. See, e.g., United States v. Sisal Sales Corp., 274 U.S. 268, 275-76 (1927).

In 1945, the Court of Appeals for the Second Circuit established an "effects test" to determine whether there was antitrust jurisdiction over foreign conduct. See United States v. Aluminum Corp. of Am., 148 F.2d 416, 443-44 (2d Cir. 1945) (Hand, J.). Aluminum Corp. held that a federal court had jurisdiction over the conduct of a foreign corporation where the conduct was intended to, and did in fact, affect United States commerce. Id. at 443 ("We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States." (citation omitted)). Over the next half-century, the "effects test," despite its apparent simplicity, proved difficult to apply in many Sherman Act cases. Considerations of international comity, not expressly considered in Aluminum Corp., occasionally entered the

_____

2. 15 U.S.C. S 4 provides, "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of [the Sherman Act]."

analysis of later courts. See, e.g., Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n, 701 F.2d 408, 413-16 (5th Cir. 1983); Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 613-15 (9th Cir. 1976).

Legislating on this background, Congress in 1982 enacted Title IV of the Export Trading Company Act-- known as the Foreign Trade Antitrust Improvements Act -- to facilitate domestic exports and to clarify the application of United States antitrust laws to foreign conduct. The Foreign Trade Antitrust Improvements Act encourages United States exports by facilitating the formation of export trading companies and by exempting certain export transactions from the antitrust laws. 15 U.S.C.S 4001(b); Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 n.23 (1993) ("The FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy . . . ."). The Foreign Trade Antitrust Improvements Act also promotes the "certainty in assessing the applicability of American antitrust law to international business transactions and proposed transactions." H.R. REP. NO. 97-686 (1982),reprinted in 1982 U.S.C.C.A.N. 2494.3

Although passed two decades ago, few federal courts have had occasion to apply the Foreign Trade Antitrust Improvements Act. In one such case, we held the Act demonstrated Congress's intent to exempt from the Sherman Act export transactions not injuring the United States economy, thereby relieving exporters from a competitive disadvantage in foreign trade. Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 227 F.3d 62, 71 (3d Cir. 2000); see also H.R. REP. NO. 97-290 (1982), reprinted in 1982 U.S.C.C.A.N. 1234 ("It is the purpose of this act to increase United States exports of products and services by . . . modifying the application of the antitrust laws to certain export trade."). In Carpet Group, we held defendants'

3. As the United States Court of Appeals for the Fifth Circuit has observed, "[T]he federal courts have generally disagreed as to the extraterritorial reach of the antitrust laws . . . . However, as far as this appeal is concerned, our work is simplified by Congress' passage in 1982 of the FTAIA, which specifically exempts certain foreign conduct from the antitrust laws." Statoil, 241 F.3d at 423-24.

conduct controlled the inquiry over subject matter jurisdiction. 127 F.3d at 73 ("The crux of [plaintiffs'] case involves [defendants'] conduct in the United States, not conduct abroad. We hold that these activities are not the type of conduct Congress intended to remove from our antitrust jurisdiction when it enacted the FTAIA."); see also Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC , 148 F.3d 1080, 1086-87 (D.C. Cir. 1998) (alleged injury to advertisers in the United States satisfied the Foreign Trade Antitrust Improvements Act, regardless of the geographic location of the supplier plaintiffs).

In Carpet Group, we addressed the applicability of the Foreign Trade Antitrust Improvements Act before considering general subject matter jurisdiction under the Sherman Antitrust Act. 227 F.3d at 69. We will employ a similar approach here. If the Foreign Trade Antitrust Improvements Act does not bar this suit, then it will be necessary to address subject matter jurisdiction under the Sherman Act.

Plaintiffs contend there is subject matter jurisdiction and the Foreign Trade Antitrust Improvements Act does not bar their claim. As noted, the District Court dismissed plaintiffs' claim under Fed. R. Civ. P. 12(b)(1), holding:

> [A]ssuming as true that the alleged conspiracy and the actions taken in furtherance thereof did occur within United States commerce, the plaintiffs aver nothing from which this Court could find that Defendants' purported conspiracy caused any injury which was felt in the U.S. or which affected the American economy in any way.

152 F. Supp. 2d at 834. We exercise plenary review over this legal conclusion. Gould Elec., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). In this Rule 12(b)(1) appeal, "we review only whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." Licata v. United States Postal Serv., 33 F.3d 259, 260 (3d Cir. 1994); see also Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977) (when considering a "facial" attack under

Rule 12(b)(1), "the court must consider the allegations of

the complaint as true").4

IV.

Section 402 of the Foreign Trade Antitrust Improvements Act provides:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless --
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect --
>
>  (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
>  (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of [the Sherman Act] other than this section.

---

4. Challenges to subject matter jurisdiction under Rule 12(b)(1) may be "facial" or "factual." Facial attacks, like this one, contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true. NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 341 & n.7 (3d Cir. 2001). In contrast, a trial court considering a factual attack accords plaintiff 's allegations no presumption of truth. In a factual attack, the court must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings. Accord Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1260-61 (11th Cir. 1997); Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990); Oaxaca v. Roscoe, 641 F.2d 386, 391 (5th Cir. 1981). In Cestonaro v. United States, 211 F.3d 749 (3d Cir. 2000), we said, "Because the government's challenge to the District Court's jurisdiction was a factual one under Fed. R. Civ. P. 12(b)(1), we are not confined to the allegations in the complaint (nor was the District Court) and can look beyond the pleadings to decide factual matters relating to jurisdiction." Id. at 752 (citation omitted).

10

> If [the Sherman Act] appl[ies] to such conduct only because of the operation of paragraph (1)(B), then[the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. S 6a (1997).

As noted, the central issue on appeal is whether the Foreign Trade Antitrust Improvements Act bars subject matter jurisdiction in this Sherman Antitrust Act case. Therefore, our primary task is one of statutory

interpretation. Cf. United States v. Knox, 32 F.3d 733, 744 (3d Cir. 1994). We have described the Foreign Trade Antitrust Improvements Act as "inelegantly phrased." Carpet Group, 227 F.3d at 69 (quoting United States v. Nippon Paper Indus. Co., 109 F.3d 1, 4 (1st Cir. 1997)). In rather convoluted language, the Foreign Trade Antitrust Improvements Act introduces two requirements that must be satisfied for a plaintiff to state a valid antitrust claim regarding "conduct involving trade or commerce . . . with foreign nations."[5] The first is whether the conduct in fact involves "trade or commerce (other than import trade or import commerce) with foreign nations," as those terms are understood under the statute. 15 U.S.C. S 6a. The second evaluates whether defendants' conduct has "a direct, substantial, and reasonably foreseeable" anticompetitive effect on United States commerce and whether that conduct "gives rise" to a Sherman Act claim. Id. S 6a(1)-(2). The first

_____

5. Whether plaintiffs are United States citizens is irrelevant to our inquiry. 15 U.S.C. S 15 ("Suits by persons injured") provides jurisdiction for damage claims brought by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." Id. The legislative history of the Export Trading Company Act states, "Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do. Indeed, to deny them this protection could violate the Friendship, Commerce and Navigation treaties this country has entered into with a number of foreign nations." H.R. REP. NO. 97-686, reprinted in 1982 U.S.C.C.A.N. 2495. And in Pfizer, Inc. v. India, 434 U.S. 308 (1978), the Supreme Court held that allowing foreign plaintiffs to enforce United States antitrust laws helped compensate victims while deterring future violations. Id. at 314-15.

11

inquiry focuses on defendants' conduct, while the second inquiry focuses on the geographical effect of that conduct.[6]

A.

The first inquiry derives from S 6a of the Foreign Trade Antitrust Improvements Act: "[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless . . . ." We must determine whether the conduct plaintiffs describe is "trade or commerce with foreign nations" or "import trade or commerce with foreign nations."[7] Stated differently, under the Foreign Trade Antitrust

_____

6. Plaintiffs contend the Foreign Trade Antitrust Improvements Act's principal purpose was to reduce the growing United States trade deficit. For this reason, they suggest the Foreign Trade Antitrust Improvements Act does not bar their suit because their claim involves neither "export" nor "wholly foreign" commerce, the only types of activity covered by the statutory language. Because defendants, United States companies, allegedly colluded within the United States to fix prices paid in United States dollars, plaintiffs maintain the conduct at issue cannot be

described as "export commerce" or "wholly foreign commerce."

We disagree. Shreds of the Foreign Trade Antitrust Improvements Act's legislative history can be interpreted as supporting plaintiffs' argument relating to the statute's purpose. E.g., H.R. REP. NO. 97-686, reprinted in 1982 U.S.C.C.A.N. 2499 (employing the "export or purely foreign commerce" language. But as noted, the legislative history contains other justifications for the Act as well. E.g., id., reprinted in 1982 U.S.C.C.A.N. 2494 (noting the Foreign Trade Antitrust Improvements Act's "promot[ion] of certainty in assessing the applicability of American antitrust law to international business transactions and proposed transactions"). It would therefore appear that the text of the Act demonstrates more than one purpose. More importantly, the Supreme Court has held that "[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive." Escondido Mut. Water Co. v. La Jolla, Rincon, San Pasqual, Pauma & Pala Bands of Mission Indians, 466 U.S. 765, 772 (1984) (quotation and citations omitted). The plain language of the statute does not limit its scope to "export" or "wholly foreign" commerce. Instead, it addresses whether defendants' conduct "involv[es] trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. S 6a. We must, of course, apply the plain text of the statute.

7. Of course, the conduct need not necessarily be one or the other.

12

Improvements Act, the Sherman Antitrust Act applies to conduct "involving" import trade or import commerce with foreign nations, provided other jurisdictional hurdles are cleared. Carpet Group, 227 F.3d at 69.

1.

The phrase "trade or commerce with foreign nations" includes transactions between foreign and domestic commercial entities, not just transactions involving a foreign sovereign. See, e.g., Hartford Fire Ins., 509 U.S. at 796 (Sherman Act applicable to London insurers engaging in unlawful conspiracies to affect United States markets); see also United States v. Holliday, 70 U.S. 407, 417 (1866) ("Commerce with foreign nations, without doubt, means commerce between citizens of the United States and citizens or subjects of foreign governments, as individuals."). Generally, the conduct must involve a United States purchaser or seller. Cf. Statoil, 241 F.3d at 426; In re Copper Antitrust Litig., 117 F. Supp. 2d 875, 882 (W.D. Wisc. 2000) ("The term 'commerce . . . with foreign nations' generally refers to transactions in which a foreign seller deals with an American purchaser, or vice versa . . . ." (citations omitted)).8 But where conduct allegedly violating the Sherman Act is directed at the competitiveness of a foreign market, such conduct involves "foreign trade or commerce." See Kruman v. Christie's Int'l PLC , 284 F.3d 384, 395 (2d Cir. 2002) ("[W]hen there is conduct directed at reducing the competitiveness of a foreign market . . . such conduct involves foreign trade or commerce, regardless of whether some of the conduct occurred in the United States.").

The complaint alleges a conspiracy between four domestic airlines and their trade association to fix commissions paid to foreign travel agents located outside the United States. Defendants' alleged conduct was directed at reducing the competitiveness of Costa Rican, Nicaraguan, and similarly situated foreign travel agents, all

---

8. Article I, Section 8 of the United States Constitution gives Congress the authority to regulate interstate commerce and "commerce with foreign nations."

of whom were foreign-based. Therefore, the complaint properly alleges trade or commerce with foreign commercial entities.9

2.

Next we consider whether defendants' conduct involves "trade or commerce with foreign nations" that is "import trade or import commerce." If so, plaintiffs' claims could still be cognizable under the Sherman Act, because the Foreign Trade Antitrust Improvements Act only removes certain non-import commerce from federal antitrust jurisdiction. See Carpet Group, 227 F.3d at 69 ("[T]he initial sentence of Section 6a, along with its 'import trade or commerce' parenthetical, provides that the antitrust law shall apply to conduct 'involving' import trade or commerce with foreign nations (provided, of course, that jurisdiction is found to exist under the Sherman Act itself)."). In Carpet Group, we held, "Since the FTAIA clearly states that the Sherman Act is not applicable to trade or commerce other than import trade or import commerce, the Sherman Act continues to apply to import trade and import commerce, thereby rendering the FTAIA's requirement of a direct, substantial, and reasonably foreseeable effect inapplicable to an action alleging an impact on import trade and import commerce." Id. at 72 (quoting 54 Am. Jur. 2d S 18, at 77)).10

---

9. Moreover, plaintiffs' argument is undermined by their pleadings. Section One of the Sherman Act, on which plaintiffs base their claims, prohibits "trade or commerce among the several States, or with foreign nations." 15 U.S.C. S 1. The complaint does not allege trade or commerce "among the several States." Therefore, to be cognizable, plaintiffs' allegations must depict a restraint of "trade or commerce with foreign nations." Plaintiffs cannot argue their allegations do not encompass "trade or commerce . . . with foreign nations" for Foreign Trade Antitrust Improvements Act purposes without sacrificing their ultimate statutory claim under the Sherman Act.
10. Plaintiffs contend our holding in Carpet Group established a general rule that if defendants' alleged conduct is "based" in the United States, the Foreign Trade Antitrust Improvements Act is no bar to federal antitrust jurisdiction. But Carpet Group provides no such bright line. In Carpet Group the defendants' "import" activity was clear: "Plaintiffs charge that Defendants engaged in a course of activity designed to

ensure that only United States importers, and not United States retailers, could bring oriental rugs manufactured abroad into the stream of American commerce." 227 F.3d at 72. To that extent, the facts of Carpet Group are clearly distinguishable.

14

The dispositive inquiry is whether the conduct of defendants, not plaintiffs, involves "import trade or commerce." Id. at 71-72. The Foreign Trade Antitrust Improvements Act does not define the term "import," but the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad. See, e.g., Webster's Third New International Dictionary (1986) (defining an "import" as "something (as an article of merchandise) brought in from an outside source (as a foreign country)"); Black's Law Dictionary (6th ed. 1990) (defining an "import" as a "product manufactured in a foreign country, and then shipped to and sold in this country"). The travel agent plaintiffs contend the airlines "imported" their services for the purpose of selling airplane tickets. But the complaint alleges that defendants-- the four air carriers and their trade association -- only set the rates that foreign-based travel agents could charge for their services. Defendants did not directly bring items or services into the United States. Therefore, they cannot be labeled "importers." Nor have they engaged in "import trade or commerce."

In Kruman, defendants' conspiracy was "directed at controlling the prices they charged for their services in foreign auctions." 284 F.3d at 395. The Court of Appeals for the Second Circuit found defendants' conduct did not involve "import trade or commerce":

> The relevant inquiry is whether the conduct of the defendants -- not the plaintiffs -- involves import trade or commerce. The plaintiffs did not describe conduct by the defendants that was directed at an import market. To the contrary, the defendants' conspiracy appears to have been directed at controlling the prices they charged for their services in foreign auctions. As the district court aptly observed, the commerce that is the focus of this case is the charging of fixed commissions on the purchase and sale of goods at foreign auctions, not the trade in and subsequent movement of the goods that were purchased and sold.

Id. (quotations and citations omitted). That "some of the goods purchased in those auctions may ultimately have been imported by individuals into the United States" was

15

immaterial to determining if defendants were involved in "import trade or import commerce." Id. at 395-96. In this respect, the facts here are similar. The alleged conspiracy in this case was directed at commission rates paid to foreign

travel agents based outside the United States. That some of the services plaintiffs offered were purchased by United States customers is not dispositive under this inquiry. Defendants were allegedly involved only in unlawfully setting extra-territorial commission rates. Their actions did not directly increase or reduce imports into the United States.

The statutory term "involving" has a precise meaning.11 In Carpet Group, we compared the "import trade or commerce" language with another provision of the statute:

> Admittedly, the FTAIA differentiates between conduct that "involves" such [import] commerce, and conduct that "directly, substantially, and foreseeably" affects such commerce. To give the latter provision meaning, the former must be given a relatively strict construction.

227 F.3d at 72. Unlike in Carpet Group, where the defendant association identified itself as an organization of "rug importers," none of the airline defendants or the IATA self-identifies as an "importer" here. Id. Nor, under the terms of the statute, were defendants "involved" in any of plaintiffs' "exporting activity."

Nor do we agree with plaintiffs' contention that a foreign travel agent's access to a computer system based in the United States "transforms" "foreign commerce" into "import commerce." Again, our focus remains on the conduct of defendants, not plaintiffs, rendering this argument extraneous. But we note that under plaintiffs' interpretation, a legion of activities transacted by foreign merchants with some connection to instruments in the United States economy -- a telephone, a fax machine, an Internet connection -- would constitute "import commerce."

_____

11. As noted, 15 U.S.C. S 6a provides:"[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless . . . ."

16

Although defendants paid commissions in United States dollars, neither the payments nor their calculations on computers based in the United States are properly considered "imports." No items or services were brought into the United States by the payments alone. Nor can plaintiffs demonstrate that defendants' conduct reduced imports of goods or services into the United States. Therefore, defendants were not involved in "import trade or import commerce," but rather were engaged in"conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C.S 6a.

B.

As we have stated, the Foreign Trade Antitrust

Improvements Act bars plaintiffs' claim unless defendants' conduct has "a direct, substantial, and reasonably foreseeable" anticompetitive effect on United States commerce, and that conduct "gives rise" to a Sherman Act claim.12 15 U.S.C. S 6a(1)-(2). We turn now to this second aspect of the statutory analysis.

1.

Plaintiffs allege defendants' conduct has substantially reduced their business values, forcing at least one member of the putative class out of business. But the District Court found the complaint contained no allegations amounting to any "effect" on United States commerce, failing to satisfy the requirements of 15 U.S.C. S 6a(1)(A). 152 F. Supp. 2d at 834.

We agree. The "direct, substantial, and reasonably foreseeable effect" test was intended to serve as "a simple

_____

12. The Supreme Court's opinion in Pfizer does not alter our analysis, because it preceded the enactment of the Foreign Trade Antitrust Improvements Act by four years. Moreover, the holding in Pfizer is cabined to the question of whether a foreign government qualified as a "person" under the Sherman Act. 434 U.S. at 320 (holding "that a foreign nation otherwise entitled to sue in our courts is entitled to sue for treble damages under the antitrust laws to the same extent as any other plaintiff ").

and straightforward clarification of existing American law." H.R. REP. NO. 97-686, reprinted in 1982 U.S.C.C.A.N. 2487-88. The House Judiciary Committee Report accompanying the Foreign Trade Antitrust Improvements Act stated: "Since Judge Learned Hand's opinion in United States v. Aluminum Co. of America, 148 F.2d 416, 443-44 (2d Cir. 1945), it has been relatively clear that it is the situs of the effects, as opposed to the conduct, that determines whether United States antitrust law applies." H.R. REP. NO. 97-686, reprinted in 1982 U.S.C.C.A.N. 2490.

The Foreign Trade Antitrust Improvements Act's emphasis on the geographical "effect" of allegedly illegal conduct reiterates longstanding antitrust principles.13 Above all, the United States antitrust laws strive to maintain competition in our domestic markets. See 1 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW 4 (2000) ("The general goal of the antitrust laws is to promote 'competition' . . . ."). Generally, federal antitrust laws do not extend to protect foreign markets from anticompetitive effects and "do not regulate the competitive conditions of other nations' economies." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 (1986) (citations omitted); see also Statoil, 241 F.3d at 421 (applying Matsushita to an Foreign Trade Antitrust Improvements Act claim). But it is "well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce

some substantial effect in the United States." Hartford Fire
Ins., 509 U.S. at 796.

The geographic target of the alleged anticompetitive
conduct matters greatly. As the Court of Appeals for the
Second Circuit recently observed, "There is a distinction
between anticompetitive conduct directed at foreign
markets that only affects the competitiveness of foreign
markets and anticompetitive conduct directed at foreign
markets that directly affects the competitiveness of

---

13. To reiterate, while the analysis of the "trade or commerce (other than
import trade or import commerce) with foreign nations" prong focuses
exclusively on defendants' conduct, the analysis of the "direct,
substantial, and reasonably foreseeable" prong focuses exclusively on the
geographical effect of defendants' conduct.

18

domestic markets. The antitrust laws apply to the latter
sort of conduct and not the former." Kruman , 284 F.3d at
393.

Plaintiffs claim that collusion by United States air
carriers to fix commissions paid to foreign travel agents
satisfies the statutory language. But that allegation does
not characterize an "effect" on United States commerce. The
alleged collusion is the reason for the lawsuit. It does not
designate the geographical effect of defendants' allegedly
illegal activity. That certain activities might have taken
place in the United States is irrelevant if the economic
consequences are not felt in the United States economy.
Fixing the commissions paid foreign travel agents might
constitute an illegal conspiracy.14 But this conspiracy only
targets the commissions foreign travel agents would receive
for work performed outside the United States. United States
antitrust laws only apply when a price-fixing conspiracy
affects the domestic economy. Cf. Statoil, 241 F.3d at 427-
28 (rejecting plaintiffs' attempt to equate "effect" and
"conduct" in this context as "not true to the plain language
of the FTAIA" and an overly "expansive reading of the
antitrust laws" never intended by Congress). Several
antitrust actions have been dismissed on analogous
grounds. See, e.g., Matsushita, 475 U.S. at 582 n.6 ("The
Sherman Act does reach conduct outside our borders, but
only when the conduct has an effect on American
commerce.") (citation omitted) In re Copper Antitrust Litig.,
117 F. Supp. 2d at 887 ("[I]t is irrelevant that some of
defendants' conduct took place in the United States. It was
not the conduct that caused plaintiffs' injuries."); Liamuiga
Tours v. Travel Impressions, Inc., 617 F. Supp. 920, 924
(E.D.N.Y. 1985) (dismissing a plaintiff service operator's
claim against an American wholesale tour operator
operating in St. Kitts, where all "effects" from the
conspiracy were felt outside the United States). Therefore,
plaintiffs cannot state a cognizable Sherman Act claim,

14. The Foreign Trade Antitrust Improvements Act's legislative history provides, "[T]he full committee added language to the Sherman and FTC Act amendments to require that the 'effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws." H.R. REP. NO. 97-686, reprinted in 1982 U.S.C.C.A.N. 2496-97.

19

given the plain text of the Foreign Trade Antitrust Improvements Act.15

We do not reach plaintiffs' contentions, first raised on appeal, that defendants' conduct could have affected travel agencies and travelers based in the United States. See United Parcel Serv., Inc. v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union No. 430, 55 F.3d 138, 140 n.5 (3d Cir. 1995) ("It is the general rule that issues raised for the first time at the appellate level will not be reviewed.") (citations omitted). The complaint only sought class certification for"[a]ll IATA-accredited travel agents in Latin America and the Caribbean, excluding any travel agencies owned in whole or in part by defendants to this litigation, or their affiliates or subsidiaries." That plaintiffs now seek to include United States companies or tourists in the class cannot alter our jurisdictional analysis, because those claims were first raised on appeal. Cf. Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734-36 (3d Cir. 1970).

Nor need we remand these proceedings to allow plaintiffs to demonstrate "newly discovered effects" on United States commerce. Though they had ample notice of possible deficiencies in their complaint, plaintiffs made no attempt to amend before the District Court ruled on the motion to dismiss. Moreover, the District Court appropriately considered the possible "effects" of defendants' actions, and how they impacted its jurisdiction. Given these circumstances, we will not grant leave to amend.

---

15. The travel agents were permanently located outside the United States, where they performed services for travelers based in their countries and elsewhere, including the United States. In this sense, the facts here are distinguishable from those described in the dissenting opinion in Statoil: "The claim is that defendants allocated the market for hundreds of millions of dollars of commerce -- an allegation that placed United States markets at the mercy of monopoly charges in an industry vital to national security. The charged conspiracy was no foreign cabal whose secondary effects only lapped at United States shores." 241 F.3d at 431 (Higginbotham, J., dissenting).

20

2.

Even if plaintiffs identified a "direct, substantial, and reasonably foreseeable" anticompetitive effect on United States commerce, they would need to demonstrate the

anticompetitive effect "gives rise to a claim" under the Sherman Act. 15 U.S.C. S 6a(2). We will not consider this element. But we note the meaning of 15 U.S.C. S 6a(2) has split two of our sister circuits. In Statoil, the Court of Appeals for the Fifth Circuit, in a divided opinion, held:

> Based on the language of Section 2 of the FTAIA, the effect on United States commerce -- in this case, the higher prices paid by United States companies for heavy-lift services in the Gulf of Mexico -- must give rise to the claim that Statoil asserts against the defendants. That is, Statoil's injury must stem from the effect of higher prices for heavy-lift services in the Gulf.

241 F.3d at 427; see also Matsushita, 475 U.S. at 584 n.7 ("However one decides to describe the contours of the asserted conspiracy -- whether there is one conspiracy or several -- respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief."). But in Kruman, the Court of Appeals for the Second Circuit, without referencing Statoil, reached the contrary conclusion:

> [A] violation of the Sherman Act is not predicated on the existence of an injury to the plaintiff. . . . Rather than require that the domestic effect give rise to an injury that would serve as the basis for a Clayton Act action, subsection 2 of the FTAIA only requires that the domestic effect violate the substantive provisions of the Sherman Act.

284 F.3d at 399-400. We need not take sides in this dispute. Plaintiffs have failed to allege a "direct, substantial, and reasonably foreseeable effect" on United States commerce. 15 U.S.C. S 6a(1). We reserve consideration on this element.

For these reasons, plaintiffs' claims are barred by the Foreign Trade Antitrust Improvements Act. Therefore, they may not state a cognizable Sherman Act claim.

21

V.

Defendants also contend plaintiffs lack standing under United States antitrust laws, a proposition not squarely addressed by the District Court.16 This argument implicates many of the same issues as the jurisdictional analysis under the Foreign Trade Antitrust Improvements Act. And for the reasons noted, we likewise find plaintiffs lack antitrust standing. See Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535-45 (1983) (holding the standing inquiry in antitrust cases is dependent on the finding of subject matter jurisdiction).

To sue under the United States antitrust laws, plaintiffs must have suffered an injury the antitrust laws were intended to prevent, and the injury must flow from that

which makes the defendants' acts unlawful. Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111-13 (1986); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487 (1977); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 927 (3d Cir. 1999); Int'l Raw Materials, Inc. v. Stauffer Chem. Co., 978 F.2d 1318, 1328 (3d Cir. 1992); see also Pfzizer, 434 U.S. at 314 ("Congress' foremost concern in passing the antitrust laws was the protection of Americans. . . .").

Plaintiffs' injuries occurred exclusively in foreign markets. They are not of the type Congress intended to prevent through the Foreign Trade Antitrust Improvements Act or the Sherman Act. Cf. In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d 702, 716 (D. Md. 2001) ("a plaintiff who has not participated in the U.S. domestic market may not bring a Sherman Act claim under the FTAIA"). Unlike in Carpet Group, where the plaintiffs' harm was "inextricably intertwined with the defendants' wrongdoing," 227 F.3d at 77 (quotation and citations omitted), the conduct at issue here was not directly related to the United States marketplace.

_____

16. For this reason, undoubtedly, the issue has not been extensively briefed by the parties.

22

VI.

Defendant IATA urges us to affirm on the basis of its alleged statutory immunity under Sections 412 and 424 of the Federal Aviation Act, 49 U.S.C. SS 41308-41309. The Act allows the Secretary of Transportation to "exempt a person affected by the order from the antitrust laws to the extent necessary to allow the person to proceed with the transaction specifically approved by the order and with any transaction necessarily contemplated by the order." Id. S 41308(b). Because we need address only the jurisdictional issues, we will not address this matter.

VII.

For the foregoing reasons we will affirm the judgment of the District Court. The Foreign Trade Antitrust Improvements Act acts as a bar to plaintiffs' proposed Sherman Antitrust Act class action.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

23